1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4          v.                    21 Cr 355 (RMB)

5   ROBERT BALDUCCI,

6            Defendant.
                              Sentence
7   ------------------------------x

8                              New York, N.Y.
                              April 13, 2022
9                              11:00 a.m.

10  Before:

11

12                HON. RICHARD M. BERMAN,

13                              District Judge

14                     APPEARANCES

15  DAMIAN WILLIAMS
       United States Attorney for the
16       Southern District of New York
    BY: JARROD SCHAEFFER
17       Assistant United States Attorney

18  LORRAINE GAULI-RUFO
       Attorney for Defendant

19

20

21

22

23

24

25

1           (Case called)

2           THE DEPUTY CLERK:  We have AUSA Jarrod Schaeffer.  We

3   have defense counsel Lorraine Gauli-Rufo.  We have her client,

4   Robert Balducci.  We have the court reporter, Kelly Surina.

5           THE COURT:  Are we expecting anybody else?  Sometimes

6   there are family members or people who have written letters,

7   etc.

8           Are they anticipated to be on this video call, or no?

9           MS. GAULI-RUFO:  Are they anticipated to be on,

10  Robert?

11          THE DEFENDANT:  No.  My family is here.

12          THE COURT:  So they can see and hear, Mr. Balducci?

13          THE DEFENDANT:  Yes, your Honor.

14          THE COURT:  All right.  So I'm ready to proceed.

15          This may take us a while.  The first thing we have to

16  clear up is how we're doing this sentencing, by

17  videoconference.

18          I'm here in the courthouse in factor in New York.  I'm

19  ready, willing, and able to do an in-person sentencing.  But we

20  did get a letter I think dated March 10, 2022, in which the

21  defense counsel has requested proceeding in this fashion.

22          And, if I remember correctly, it's due in part at

23  least to the fact that Mr. Balducci had not been vaccinated.

24  So that could be an issue.

25          Do I have that right, Counsel?

1          MS. GAULI-RUFO:  Yes, your Honor, you do.

2          THE COURT:  Okay.  So I want to make sure that defense

3     counsel and Mr. Balducci have discussed in detail the fact that

4     he would have the right and does have the right to have a

5     sentencing proceeding, such as the one we are about to embark,

6     on held in a courthouse in person with the Court.  And we make

7     that available, and I still would make it available, if you

8     wanted to change your mind in any way.

9          But I want to make sure that you've discussed that.

10    And if you still are determined and wish to go forward as we

11    are today, whether Mr. Balducci waives any right that he might

12    to appear in the courtroom live, so to speak.

13         MS. GAULI-RUFO:  Yes, your Honor.  I have discussed

14    that with Mr. Balducci.  And Mr. Balducci has specifically

15    requested to do this virtually and has waived any right that he

16    might have to appear in person.

17         THE COURT:  Okay.  Mr. Balducci, you've gone over this

18    issue with your counsel.  And she's indicating that you are

19    waiving your right to appear in a courtroom for your

20    sentencing.

21         THE DEFENDANT:  Yes, your Honor.

22         THE COURT:  Is that all right with the government, to

23    proceed in this fashion?

24         MR. SCHAEFFER:  Yes, your Honor.

25         THE COURT:  It's all right with me too.  The COVID

pandemic has caused issues.  And for a long time, the courtroom
was not available.  It is available now.  But it's the
defendant's right.  And if he wishes to waive it, that's
agreeable and acceptable to me.

So let me begin by saying, which many of you already
know, when it comes to sentencing in a criminal case, which
this is, we always start by saying that as a result of
Supreme Court determinations, the United States Sentencing
Guidelines, which at one point in time were mandatory, are no
longer mandatory.

And that's, in part, thanks to several Supreme Court
decisions.  One is called *Gall v. United States*, a 2007
decision.  One is called *Kimbrough v. United States*, a 2007
decision.  Another is called *United States v. Booker*, a 2005
decision of the Supreme Court.  And another is *United States v.
Crosby*, also a 2005 decision of the Supreme Court.

And a more recent decision by our own Second Circuit
Court of Appeals is *United States v. Regalado*, a 2008 Second
Circuit opinion.  And all of these together tell us that the
guidelines are no longer mandatory.  They are at the same time
advisory, and they're an important starting point for
sentencing.  And they, in addition, remain a factor to be
considered.

So I have considered the process before coming out on
the bench or before joining in this videoconference.  And what

the Court has to consider -- and I will on the record this

morning -- is instead of mandatory guidelines that, in addition

to the factors to be considered, which the guidelines are now,

there are these other factors found at 18 U.S. Code, Section

3553(a).

        And they include the following -- these are the

factors that the Court must consider in fashioning a sentence.

So one is the nature and the circumstances of the offense.

        Here, there are two offenses.  One is -- this is

shorthand.  But one is conspiracy to participate in a bribery,

and the second is a bribery situation itself, the substantive

crime.  And, as I said, here, we're talking about conspiracy

and substantive bribery.

        I think that I would insert this, because this is

going to come up over and over.  I want to say that I

appreciate this whole case is a part of a situation involving

Rikers Island where Mr. Balducci was a corrections officer.

        And we'll soon discuss seven other corrections

officers, not all together.  They each were indicted separately

for participating in being bribed by inmates at Rikers Island

and entering into the system -- Mr. Balducci and these other

people as well, brought illegal contraband into Rikers Island.

        But what I wanted to say at the outset is that I do

appreciate that this entails a huge problem in managing Rikers

Island, as many have read about in the papers and heard about

 1    and, by the way, in many other federal and state prisons and

 2    jails.

 3         And I don't want to, by anything I say here today,

 4    suggest that it's the corrections officers who are the only

 5    people responsible to fix up this problem because the problem

 6    is much bigger than the role that Mr. Balducci has played.

 7         And that bigger problem is the responsibility to be

 8    fixed -- it's up to legislators.  It's up to governors.  It's

 9    up to mayors.  It's up to judges.  It's up to prosecutors I

10    would say, and it's also up to the United States attorney

11    general.

12         So we're not going to hold corrections officers

13    responsible for all the problems at Rikers Island.  But at the

14    same time, it's my opinion and position -- and I think others'

15    as well -- that corrections officers must play their part.

16         And their part has historically been to safeguard the

17    people in the jail or the prison, safeguard the inmates,

18    safeguard other guards, safeguard people who might be visiting

19    or trying to visit Rikers Island in this case.

20         And as part of their learning and teaching and

21    instruction, corrections officers, they are taught, of course,

22    that they are not permitted to bring contraband for the benefit

23    of inmates into the system.  And that's what we're talking

24    about here.

25         So we are in fact talking about, in my opinion, a very

1    serious issue.  The crimes are smuggling into Rikers Island, in

2    the case of Mr. Balducci, dangerous contraband, weapons or

3    weapon-like objects, including, in his case, some -- and you'll

4    all correct me if I get some of the details wrong -- some 18

5    scalpels, five razors, and I believe a broken metal key.  And

6    he brought them in for bribes.  He was then, of course, a

7    corrections officer.  And he brought them in for at least one

8    or two inmates.

9           And I want to say at the outset that it's difficult to

10   understate the significance of these dangerous crimes.  Again,

11   he's not the only one who has done this, either at Rikers or at

12   other facilities.  But we're talking about his case now.  Today

13   we are sentencing in his case.  And that I think is the context

14   in which we need to view this case.

15          So I was getting to the first factor that needs to be

16   considered, which is the nature and the circumstances of the

17   offense.  And I wanted to set the stage in that fashion.

18          Relatedly or related to that factor is the history and

19   characteristics of the defendant.  And this I've also gone into

20   in great detail by reading the presentence investigation

21   report; of course the submissions of defense counsel; and the

22   submissions of the assistant U.S. attorney; as well as helpful,

23   interesting, and issue-raising, in some respects, letters on

24   behalf of Mr. Balducci from family members.

25          I think his father wrote.  I think his stepmother

1    wrote.  I think his mother wrote.  I think at least two, three,

2    or four friends, childhood friends, wrote on his behalf.

3            So, moving along, the sentence I intend to impose has

4    to reflect the seriousness of the offense.  And what I'm saying

5    is it is serious.

6            In this connection also, there's an issue which will

7    come up, a factor that we're considering, which is deterrence.

8    And that issue, that factor, applies directly here to

9    Mr. Balducci's case.

10           I think deterrence, both on an individual basis --

11   that is to say the sentence would need to, in my opinion, deter

12   him -- and generally hopefully my sentence will help deter

13   others from participating in the same kind of illegal smuggling

14   of contraband into prison facilities.

15           And the reason why I'm so concerned about this

16   particular issue of deterrence in this case is I would hope

17   that this small sentence in the whole scheme of criminal

18   justice and the prisons -- but this case, this one case,

19   involved bringing in life-or-death dangerousness to inmates, to

20   guards, to other corrections officers, and to visitors.

21           As I said before and as I pointed out before, seven

22   other corrections officers were arrested at or about the same

23   time, the same date roughly, as Mr. Balducci, several of whom

24   have already been sentenced, and several more remain to be

25   sentenced.

1          We put together a chart of the eight cases, and there

2     are eight cases.  I'm going to make it Court Exhibit A.  And

3     Court Exhibit A includes USA v. Assanah, A-s-s-a-n-a-h, a case

4     presided over by Colleen McMahon.  She's scheduled to sentence

5     in her case I think in June.

6          Then there's USA v. Garrett, G-a-r-r-e-t-t, presided

7     over by Judge Caproni.  She has sentenced already.  She

8     sentenced Mr. Garrett to time served followed by three years of

9     supervised release with the first six months of supervision to

10    be served in-home detention.

11         Then there is the case of USA v. Compres.

12    Judge Engelmayer presided and presides over that case.  He

13    recently sentenced Mr. Compres, if I'm got the pronunciation

14    correct -- to six months in prison, followed by three years of

15    supervised release, as well as 300 hours of community service.

16         Then there is USA v.  Harrell, H-a-r-r-e-l-l, presided

17    over by Ronnie Abrams, Judge Ronnie Abrams.  I think that case

18    is scheduled to be sentenced in July, July 22.

19         Then there's U.S. v. Diaz, a case presided over by

20    Judge Buchwald.  And she sentenced Diaz already to time served

21    followed by three years of supervised release, 350 hours of

22    community service.

23         And then there's USA v. Lewis.  That's a case that

24    Judge Rakoff presided over.  His case, interestingly, had a

25    higher even what we call guidelines range than the others.  His

1   guideline range in that case came to 37 to 46 months.  Yet he's

2   sentenced to three years of probation.

3         I think many, if not all, of the other cases that I've

4   mentioned so far had the same guidelines range of 18 to 24

5   months as Mr. Balducci has in this case.

6         And just to round out the picture, there's USA v.

7   Pelzer.  And the sentencing there by Judge Furman is intended

8   to happen on April 26.  And finally, there's a case, another

9   case that Judge Abrams has, U.S. v. Reed.  And I believe

10  there's a sentence scheduled in that case on July 29, 2022.  So

11  this is just a handy reference.

12        By the way, I'm not suggesting -- indeed, as you'll

13  hear in a little while, I don't believe that all these cases

14  are the same.  They're roughly similar only in the sense of

15  they're Rikers Island corrections officers who took bribes and

16  introduced illegal contraband into Rikers Island.

17        But beyond that, I think there are some serious

18  distinctions, as you will hear about in a moment.  In

19  particular, at least he felt that way.  Judge Engelmayer felt

20  that his case in which -- he's the only one who sentenced to

21  incarceration.

22        I think he felt that his case was different from the

23  other cases, at least the ones that have been sentenced so far,

24  because in his case, in Engelmayer's case, the contraband was

25  as in this case, by the way, Mr. Balducci's case, was

 1    dangerous.

 2         Here, as I say, we have scalpels and razors, five

 3    razors, and this metal key, among other things.  But more about

 4    that later.  This is the universe that I've been looking at

 5    recently.

 6         So I'm still in the factors to be considered, and I'm

 7    continuing.  An objective is promoting respect for the law -- I

 8    think that's a very crucial factor here -- and providing, of

 9    course, a just punishment for the offense.

10         We need to, in addition, afford adequate deterrence to

11    criminal conduct.  We need to protect the public from further

12    crimes of Mr. Balducci, for example.  I'm not saying he will

13    commit any further crimes.  But we have to make sure that he

14    doesn't as best we can.

15         I don't mean to harp on this, but this kind of

16    behavior -- I can say it, of course, because there's been a

17    plea in this case and there's no doubt or question about

18    Mr. Balducci's guilt.

19         This behavior poses a huge danger to all who come to

20    Rikers Island, and it's no secret that it's a notoriously

21    violent and dangerous place already.  But this kind of

22    behavior, in my opinion, adds to that dangerousness and

23    violence potentially at Rikers Island.  It poses a huge threat

24    it to the New York City criminal justice system in my opinion.

25         So I'm still on the factors to be considered.  And the

 1    next one reads as to provide the defendant with needed

 2    educational or vocational training, medical care, or other

 3    correctional treatment in the most effective manner.

 4            And here, this is what I think, that that also is a

 5    very important factor in the case of Mr. Balducci.  He has

 6    been, the papers tell us, undergoing mental health therapy post

 7    his arrest and along with the other seven corrections officers

 8    who behaved in a similar lawless manner.

 9            And I have to say all the mental health issues, but I

10    think that mental health issues are, in no small measure, a

11    core of this case.  And I don't just mean, you know, there was

12    a dangerous atmosphere at Rikers Island, which we all know, and

13    it was likely dangerous certainly when Mr. Balducci was there.

14            And defense counsel will correct me if I'm wrong.  But

15    it's alleged that that dangerous, threatening atmosphere caused

16    him to be depressed, etc., and somehow or other fed into his

17    willingness to be bribed and to bring this dangerous contraband

18    into the facility.

19            If I understand the timeline, I think after his arrest

20    and while he has been on pretrial release, I think it's

21    pretrial who organized therapy which he I think is still

22    participating in.  And that was a very important pretrial asset

23    that was applied and participated in by Mr. Balducci.

24            My concern is, although some of the defense papers

25    suggest that, you know, in less than a year's therapy, he's --

1    I don't want to say "cured" so to speak.  But there's a

2    suggestion there that he's recovered, particularly because he's

3    out of working at Rikers and as a corrections officer and has

4    worked out some significant mental health issues which, to my

5    understanding, include depression, PTSD, suicidal ideation.

6          These all come up in the papers.  I must say I

7    don't -- this is just based on my own experience, but I think

8    there are some serious issues here.  There was reported to be a

9    suicide attempt by Mr. Balducci.

10          And I don't mean to be flip about it, but those issues

11   don't just rise up late in life and then disappear with a

12   course of therapy.  I think there are issues here, mental

13   health issues, that do need to be addressed -- and I will

14   certainly address them in my sentence -- going forward and for

15   some time to come.

16          And I also think, having read the papers carefully,

17   that there have historically been some drug and alcohol issues

18   here.  And I don't have my fingers right on -- certainly,

19   there's marijuana.  I think there was some cocaine, maybe some

20   Percocet involved, and some serious alcoholism also involved.

21   This is another set of issues that are a big concern to me and

22   I will also endeavor to resolve or help in this sentence.

23          But my point is -- and I don't know all the details,

24   and no one has presented all the details, for example, of the

25   attempted suicide.  But even then, I don't think any therapy,

1   at least not that I know about from reading the papers, was

2   implemented unless and until after he was arrested and pretrial

3   services said, you've got some serious issues here.

4         So I think those are long-term issues to get to the

5   quick of it, the bottom line, at least it is in most every case

6   I have where these are issues.  These mental health issues

7   don't just arise, you know, out of the blue and disappear after

8   a little bit of therapy.

9         And similarly with the drug issues -- and I think I

10   read somewhere that Mr. Balducci was smoking marijuana at the

11   age of 14, etc.  So, you know, there's more there, and I will

12   address those issues also in my sentence.

13         So this is under the factor of providing the defendant

14   with needed we're calling them educational or vocational

15   training.  I don't think those are so much the issue as is

16   medical care or other correctional treatment.  And by that I

17   mean mental health treatment and drug-abuse treatment.

18         And so I'm almost finished with the factors that I

19   need to consider.  And, by the way, I'm saying more than just

20   what the factors are.  I hope that people are understanding

21   that I'm actually giving part of the sentence.  Along with just

22   mention the factors, I'm also explaining that I think there are

23   also issues around that that are very important to consider.

24         So we also look at the kinds of sentences that are

25   available.  There's a wide range.  We've seen just in these

1   eight cases that several judges have provided no jail time,

2   just time served, essentially, maybe some community service.

3   But then we have Judge Engelmayer who felt and feels compelled

4   to provide six months of incarceration, along with other

5   factors.

6          In looking at the kinds of sentences that are

7   available, we also look at the kinds of sentences and the

8   sentencing range in the sentencing guidelines which I think I

9   said before.  I've said it about other cases, but it's true

10  here too.

11         The agreed to, agreed to by the defense and the

12  government, in the plea agreement in this case, stipulates a

13  guideline range of 18 to 24 months of incarceration.  Now,

14  people can argue up and down, but that is what has been agreed

15  to in the plea agreement.

16         We also look at any policy statements that may have

17  been issued by the United States Sentencing Commission which

18  apply in this case.

19         And then we seek to avoid what are called unwarranted

20  sentence disparities among similarly situated defendants.  Now

21  that's gotten some traction here by other judges who have

22  sentenced in this case.

23         My deeply held position -- and we'll get to this a

24  little bit later on.  I don't believe there are any unwarranted

25  sentence disparities that are applicable here.  I firmly

 1   believe that.

 2          So I'm going to just move along.  I will a little bit

 3   later on talk a little bit about those other cases, but I

 4   absolutely have no concern that there's any -- I'm concerned

 5   about the issue, and I'll look at it.  But there are no

 6   unwarranted disparities is what I'm trying to say.

 7          And we seek to -- the last factor.  I think I've got

 8   them all -- is to provide for restitution.

 9          Now, in this case, there are some financial penalties

10   which have been agreed to.  I've just received -- and I'm

11   signing -- what's called a Consent Preliminary Order of

12   Forfeiture, Money Judgment.  And it looks like it's signed by

13   defense counsel and the government.

14          And it provides for forfeiture in the amount of

15   $2,800, which is money, as I understand it, that directly came

16   to Mr. Balducci's pocket, so to speak, as a result of taking

17   contraband to Rikers Island.  He received that amount.

18          Am I being requested to sign this forfeiture agreement

19   that has been signed?

20          Let me ask first defense counsel.

21          Are you in accord with this $2,800 forfeiture money

22   judgment?

23          MS. GAULI-RUFO:  Yes, your Honor.  We are.

24          THE COURT:  Counsel for the government, is that your

25   opinion as well?

1          MR. SCHAEFFER:  Yes, your Honor.

2          THE COURT:  So just for the record, I've seen this

3     issue quite regularly in the case.  So I'm going to sign it as

4     well.

5          Is today the 13th?

6          MR. SCHAEFFER:  Yes, your Honor.

7          THE COURT:  So I have signed that order of forfeiture.

8     Now, I may have signed it already.  There is also a restitution

9     order that applies in this case.

10         Is that all signed by both of you and me already?  Or

11    is that to happen today?

12         MR. SCHAEFFER:  No, your Honor.  I don't believe that

13    we received an executed copy back yet.  But as soon as we do,

14    we'll submit it to the Court as soon as possible after

15    sentencing.

16         THE COURT:  So if you could just briefly, since that

17    topic has come up, not in all detail, but how much restitution

18    Mr. Balducci has agreed to make which will be reflected in this

19    document.

20         MR. SCHAEFFER:  Certainly, your Honor.  The

21    restitution order is for $10,028.71.  And that represents a

22    portion of his salary that he received from the New York City

23    Department of Corrections which will be forfeited, given the

24    failure to provide honest services during that period.

25         THE COURT:  And that would be roughly 20 percent of

 1   that salary that he was making?  Is that correct?

 2          MR. SCHAEFFER:  That's correct, your Honor.

 3          THE COURT:  On an annual basis?

 4          MR. SCHAEFFER:  Yes, your Honor.

 5          THE COURT:  Okay.  So I will sign that.

 6          Counsel, Defense Counsel, that is your agreement as

 7   well; right?

 8          MS. GAULI-RUFO:  Yes, your Honor.  It is.

 9          THE COURT:  Okay.  So moving along, I have determined

10   independently, but also I confirm that the 18- to 24-months'

11   guidelines range is accurate and appropriate in this case.  The

12   offense level is 21.  The criminal history category is I.  And

13   that gives rise to a guideline range of 18 to 24 months.  I am

14   in agreement with that.

15          On October 26, 2021, Mr. Balducci pled guilty before

16   me to two counts, as I mentioned earlier.  Count One was a

17   conspiracy to commit bribery and honest services wire fraud;

18   and Two is the substantive offense of bribery.

19          And he pled guilty, as I mentioned, pursuant to a plea

20   agreement which was dated -- I don't know if I said the date.

21   But it was dated September 13, 2021.  And not to beat a dead

22   horse and be too repetitive.  But that plea agreement provides

23   what we call a stipulated or agreed-to offense level of 15, a

24   criminal history category of I, and a guideline range of 18 to

25   24 months.

1          And that just simply means that that is what the

2     parties agreed to; that that is the guideline range and they

3     agreed to it, among other things, in the plea agreement.

4          The presentence investigation report is an important

5     document.  And I take it that that document has been gone over

6     carefully and thoroughly between defense counsel and

7     Mr. Balducci.

8          Is that correct?

9          MS. GAULI-RUFO:  Yes, your Honor.  That's correct.

10         THE COURT:  Mr. Balducci, you went over that

11    presentence investigation report carefully with your defense

12    counsel?

13         THE DEFENDANT:  Yes, your Honor.  That's correct.

14         THE COURT:  And so it says -- it describes the crime,

15    that during the course of the instant offense, in approximately

16    October 2020, while working as a corrections officer with the

17    New York City Department of Corrections, a prison complex on

18    Rikers Island, the defendant, Mr. Balducci, accepted multiple

19    bribes totaling between $16,500 and $15,000 in exchange for

20    agreeing to smuggle contraband into jails operated by the New

21    York City Department of Corrections.

22         I think we alluded to this before.  Mr. Balducci

23    personally derived a total of $2,800 cash, which he, as we

24    discussed, has agreed to forfeit to the government.

25         Additionally, defendant owes restitution.  He has

1    agreed to that also, as government counsel just mentioned, in

2    the amount of $10,028.71 to the New York City Department of

3    Corrections which, as government counsel mentioned, represents

4    approximately 20 percent of his annual salary during the

5    relevant time period for the honest services that he did not

6    provide as a result of his criminal conduct.  That's in the

7    presentence report at page 27.

8            Mr. Balducci is 33, he's single, he has a significant

9    other, and he has a ten-year-old son who I believe is depicted

10   in one of the submissions I got.  He looks like a lovely young

11   boy.

12           Mr. Balducci has some college education.  In the plea

13   agreement -- again, some of this is repetitive -- he has agreed

14   to make restitution in the amount of $10,028.71 to the New York

15   City Department of Corrections and restitution of approximately

16   20 percent of his salary during the offense period for the

17   honest services that he did not provide as a result of the

18   criminal conduct.  There's the forfeiture again of $2,800,

19   which we now have in writing and I have signed as well.

20           As part of the investigation into these offenses, a

21   search of one or more Rikers Island inmate cells uncovered 18

22   ceramic scalpels and a broken metal handcuff key.  A search of

23   Mr. Balducci uncovered marijuana and five metal razor blades.

24   Mr. Balducci has admitted also to smuggling packs of

25   cigarettes.

1          He has been attending weekly mental health treatment

2     at St. Mark's since July 2021.

3          Mr. Balducci, is that still going on on a regular

4     basis?

5          THE DEFENDANT:  Yes, your Honor.

6          THE COURT:  So in July of this year would be a year.

7     So that's not quite a year yet.

8          According to the presentence report, Mr. Balducci has

9     been diagnosed with chronic post-traumatic stress disorder and

10    recurrent major depressive disorder.

11         The presentence report also mentions, as I said

12    before, that records indicate that in 2020, he attempted

13    suicide by hanging.  That's all I know is what I have read,

14    which is what I just read.  I don't have any details about that

15    unfortunate situation.

16         He has had a substance-abuse history which includes

17    smoking marijuana since the age of 14.  He's also used and/or

18    abused cocaine, ecstasy, Percocet, and alcohol.

19         He's currently employed at Stanley Steamer and has

20    been so employed since his suspension at Rikers Island and

21    ultimate resignation which occurred in 2021.

22         By submission dated March 8, 2022, defense counsel

23    requests what is called a noncustodial sentence.  We briefly

24    touched on this.  It means, in those instances, for example --

25    I've mentioned some of those case with other guards.  They got

1    time served, probation.  But one case, which I think is closer

2    to our case, is Judge Engelmayer's case.  He imposed six months

3    of incarceration.

4         I think it would be very, very, very difficult to

5    consider a noncustodial sentence in Mr. Balducci's case.  But

6    I'm open-minded, and we haven't heard from defense counsel and

7    from Mr. Balducci yet.

8         Among other things, defense counsel argues that when

9    Mr. Balducci was charged in the indictment, he immediately

10   accepted responsibility and met with the government in an

11   attempt to cooperate.

12        Additionally, defense counsel asks the Court to

13   consider that defendant was a corrections officer and -- this

14   is a quote -- "that fact could subject Mr. Balducci to great

15   harm in prison, were the inmates to find out and recognize him

16   as such."

17        Defense counsel also argues that Mr. Balducci

18   committed the offense, offenses -- there are two crimes that he

19   pled to -- during times when he was overtaken by mental health

20   issues in their untreated state which culminated in a suicide

21   attempt on his life.  I'm not exactly sure of the chronology

22   myself, but maybe we'll get some more detail about that from

23   defense counsel.

24        Defense counsel argues that Mr. Balducci has had

25   serious bouts of depression, anxiety, post-traumatic stress

1    that began after he started working at Rikers Island.

2           So, Counsel, just to digress for a moment, is that the

3    position of the defense, that these mental health issues only

4    arose after he started working at Rikers Island?

5           MS. GAULI-RUFO:  Your Honor, I think -- I actually did

6    write that in my submission.  But I think, in speaking with

7    Mr. Balducci and in handling this matter, it appears that there

8    could have been undiagnosed mental issues that preceded this

9    that were just clearly brought on and exacerbated by his

10   working at Rikers Island.

11          That's when they actually came -- they were apparent

12   at that point.  Let's put it that way.

13          THE COURT:  It is just my opinion, but in my

14   experience -- and not in this case because I'm just learning of

15   the case, so to speak.  But in my experience, issues that are

16   so serious of that nature, there usually are precursors,

17   perhaps even going all the way to childhood and whatever.  It

18   would be unusual for it to just pop up.

19          What is unfortunate, if it's the case that there was

20   never any treatment, that is upsetting to me.  And also this

21   issue about drug use, I don't think that's the typical drug use

22   of teenagers who might experiment.  That's some serious stuff

23   in there -- alcohol, Percocet, marijuana, etc.

24          So this is just a guess, and take it for what it's

25   worth.  I think there are some issues there too that would have

1    been much preferable if they had been brought to the surface

2    and explored before, even perhaps in childhood.  I don't know

3    exactly what happened there, but it would be unlikely for that

4    just to crop up.

5          Defense counsel states -- and this is consistent I

6    think with what you just said -- that "work at Rikers has

7    caused him such anxiety and post-traumatic stress that he

8    dreaded going to work every day.  He acknowledged that he was

9    frightened and traumatized each day at work."

10         And here is the $64 question, similar to the one in

11   his case that was raised by Judge Engelmayer.  The question I

12   think -- I don't know if Judge Engelmayer posed it exactly as

13   this way.  But the question comes up, if it's so bad, why don't

14   you resign.

15         Incidentally, I've read all the transcripts in

16   Engelmayer's case and in Valerie Caproni's case, in Naomi

17   Buchwald's case, in Jed Rakoff's case.  So I'm pretty much -- I

18   don't remember all the details.

19         But on Judge Engelmayer's case, I know it was on his

20   mind too.  Why not resign.  If things are so dangerous, if it's

21   so upsetting and it's creating such post-traumatic stress

22   disorder and wrecking one's life, why continue.

23         I think I do remember in the letters submitted,

24   perhaps by Mr. Balducci's father or stepmother, there's perhaps

25   some indication that there was another person in the family who

1   was a corrections officer, perhaps a grandparent even, and

2   maybe that there was some pressure in the family for

3   Mr. Balducci to follow in his footsteps, family footsteps, to

4   be working as a corrections officer.

5          But you or he may want to address that later on.  But

6   he did not resign.  As far as I know, he didn't file any

7   complaints with Rikers Island.  But unfortunately, what he did

8   do was commit conspiracy and substantive bribery.

9          Defense counsel also notes that defendant has been

10  participating in mental health treatment since July 2021 which

11  seems to have helped him.  I'm very pleased to hear that.  I'm

12  always pleased when people are getting help for issues.

13         It's not even a year though that he's been getting

14  that treatment.  And my personal understanding of these issues

15  is that it will take a longer time and there is a need for more

16  therapy going forward, a significant need.

17         So defense counsel also submitted photos and letters

18  of support from Mr. Balducci's family and friends.  Those are

19  always welcome.  In another case I had yesterday, it arose -- I

20  was reading one of the letters into the record.  And the

21  defendant in that case jumped up and said, but that's not true

22  on some really specific issue, an amount of money that was

23  charged to a credit card.

24         And I said -- and I'll say now -- I didn't present it

25  as true.  It's not been, and these haven't been presented into

1   evidence.  But they are important help to the Court in getting

2   a picture of who the person is that is being sentenced.

3          And these letters are very interesting.  Frankly, in

4   my mind, they raise a couple of questions, which I don't know

5   if those people are around.  But maybe you, Defense Counsel,

6   could answer some of those questions.

7          But these letters overall reflect that he,

8   Mr. Balducci, has a support system in the community.  One

9   letter in particular from his stepmother raises -- actually

10  raises some underlying and previously undisclosed instances of

11  trauma in Mr. Balducci's life.

12         Let me see if I can -- yes.  She has a typewritten

13  letter.  I wasn't clear.  Counsel, maybe you could help me.

14         Is she a therapist herself?

15         MS. GAULI-RUFO:  I'm sorry, your Honor.  I believe his

16  mother, his actual birth mother, is a therapist.

17         THE COURT:  I think his mother is a social worker for

18  sure, and that sometimes spills over into therapy.  But the

19  letter dated March 7, 2022, from Maria Lydia Baez, Doctor --

20  it's a very helpful letter, helpful in the sense that it

21  provides context.

22         She says that Mr. Balducci had been abandoned and

23  separated from his mother.  It's kind of an inter-family -- I

24  don't know.  Well, it certainly sounds like it's genuine.  She

25  mentions that the family was passionate about law enforcement.

1   And she says:  "Having a family member serving in law

2   enforcement was our family dream."

3           So you can see how it could be troubling, how

4   troubling it is, how things have worked out.  And you read this

5   letter, and you feel -- I did -- the sadness because the dream

6   become a nightmare.  Well, she uses that word too.

7           She says:  "We never thought that our dream would be a

8   nightmare when our son must go to the worst environment when

9   his life every day is in jeopardy."

10          She says -- and it's sad -- that she regrets that "my

11  husband," Mr. Balducci's father and she, "support him to

12  achieve his wish to serve our community when the system does

13  not protect him.  He has to survive and be involved in

14  dishonest activities as a psychological defense to stay alive

15  in a hostile and dangerous environment."

16          And then she adds something that I was not familiar

17  with.  She said:  "This is known in psychology as fawn."  She

18  goes on to say that fawn is a -- I think a mechanism of the

19  human brain I think is what she's trying to say, which is a

20  form-of-defense mechanism.

21          It's not something I was familiar with.  I know

22  defense mechanisms.  I had not heard of that one, but it's not

23  unlikely that he called upon defense mechanisms for a time that

24  he was experiencing at Rikers Island.

25          Anyway, the letters are very -- they're interesting.

 1    They do add color.  There's one from his father, and there is

 2    one from his birth mother.  There's another letter from at

 3    least two or three, as I said before, family friends.  Jordan

 4    Alkiswani wrote one such letter.

 5         Farah Padamsee wrote such a letter.  I think she's a

 6    significant other of one of Mr. Balducci's childhood friends.

 7    And then these photos, these charming photos, of I assume your

 8    son, Jet, is one of them.  So I've been through every bit of

 9    what's been submitted.

10         So by letter dated March 15, 2022, the government

11    writes and requests a sentence within the guideline range of 18

12    to 24 months.  The government's letter is clear and thoughtful.

13    It argues, among other things, first -- and this is a quote --

14    "A sentence within the stipulated guideline range would

15    appropriately reflect the gravity of the defendant's offense

16    and promote respect for the law.

17         "As a corrections officer --" I'm reading from the

18    government's letter -- "the defendant was duty bound to

19    protect the inmates and employees at Rikers Island, including

20    by preventing access to drugs and other dangerous contraband.

21    Instead, the defendant ignored that duty, not merely by

22    ignoring contraband flowing into the jail, but also by

23    conspiring with others who --" I think he is referring to two

24    girlfriends of two inmates with whom he had significant contact

25    outside of jail, once at a McDonald's and once in a deli, in

 1    which these girlfriends presumably gave him the contraband to

 2    take into the jail and make available, which he did, to their

 3    boyfriends.

 4           "The aim was to introduce --" and I'm going back to

 5    the government's letter "-- prohibited substances into the

 6    OBCC --" shorthand for Otis Bantum I think Correctional Center.

 7    It's at Rikers Island in any event -- "and enrich himself at

 8    the expense of order and safety within the facility."

 9           The government goes on to say:  "Worse, defendant's

10    actions provided inmates with extremely dangerous, prohibited

11    items.  It should be readily apparent that razor blades and

12    ceramic scalpels (which would not trigger metal detectors) pose

13    grave and direct threats to the lives of the inmates, officers,

14    and staff at Rikers.

15           "Moreover, the presence of potentially deadly weapons

16    within the facility which the defendant introduced on multiple

17    occasions contributes to the culture of violence and danger

18    that has plagued the institution."

19           He uses the word "violence and danger."  I would add

20    dangerousness, absolutely outrageous behavior, conduct

21    impacting inmates, workers, other corrections officers,

22    visitors.  I would add that.

23           So now I'm interjecting myself back here.  I say that

24    the Court agrees that the defendant's conduct was egregious,

25    outrageous, dangerous, yes.  And that Mr. Balducci's actions

1    were beyond, way beyond, serious.  They were very serious.

2          The government also argues -- and I'm going back to

3    the letter -- that:

4          "A sentence within the applicable guidelines range is

5    necessary to afford adequate deterrence.  As detailed above,

6    the defendant's involvement in this smuggling scheme was not

7    confined to a single incident, and the defendant is not the

8    first corrections officer to violate his duty and conspire with

9    inmates.  Sadly, it is also unlikely that the defendant will be

10   the last corrections officer willing to place greed before his

11   obligations to the law and to the public.

12         "Because the defendant's conduct is so dangerous and

13   because it can be so difficult to detect, it is necessary to

14   deter others by sending a strong message that stark

15   consequences follow from such offenses."

16         And I would add, as I said before, it is very common

17   knowledge that Rikers Island is a dangerous, in fact, many

18   would say danger usually-out-of-control environment.

19         And I would add, as I said at the beginning, it is not

20   Mr. Balducci's responsibility to correct all of those problems

21   there, but it is also his duty not to add to them.

22         The government acknowledges that the defendant

23   attempted to cooperate with the government and provide it

24   information concerning his involvement in smuggling, as well as

25   the involvement of others.

 1          The government states that:

 2          "While such information did not lead to prosecution of

 3  another person and does not constitute substantial assistance

 4  to an investigation, the government notes that the defendant's

 5  voluntary efforts to assist law enforcement so that the Court

 6  may consider those efforts in fashioning an appropriate

 7  sentence."

 8          And I'm taking that into account in the sentence that

 9  I am going to propose in this case.

10          The government says, incidentally though -- it points

11  out that cooperation or attempted cooperation, that the

12  government did not believe that those efforts warranted a

13  below-guideline sentence.

14          The government also notes that on the day defendant

15  was arrested, eight other, as I have stated, NYC DOC employees

16  were charged in separate indictments for participating in

17  various contraband smuggling.

18          So that is my understanding of this case, what

19  happened, more or less.

20          I have also received and reviewed, as I mentioned, the

21  presentence investigation report which was prepared

22  December 17, 2021, together with that addendum dated

23  January 14, 2022; and the sentence recommendation approved

24  January 14, 2022.

25          I have defense counsel's correspondence dated March 8,

1   2022, from Lorraine Gauli-Rufo and dated March 15, 2022, from

2   AUSA Jarrod Schaeffer.

3              So I have a question now for defense counsel and

4   Mr. Balducci.  And the question is whether they together have

5   had the opportunity to read and discuss the presentence

6   investigation report, the addendum, and the sentencing

7   recommendation.

8              I'll start with defense counsel.

9              MS. GAULI-RUFO:  Yes, your Honor.  Actually, the only

10  objection that we had to the report -- it just was a factual

11  issue regarding the division that Mr. Balducci worked in at

12  Rikers.

13             He maintains that he never worked at a specific center

14  in Rikers as they allege.  But, other than that, your Honor, we

15  have no objections to the report.  And we've reviewed it

16  thoroughly.

17             THE COURT:  And, Mr. Balducci, you went over that

18  presentence report carefully with your attorney?

19             THE DEFENDANT:  Yes, your Honor.

20             THE COURT:  Defense counsel, did you lodge that

21  factual objection?

22             MS. GAULI-RUFO:  Yes, we did, your Honor.  And it is

23  present in the report -- I just saw it -- on page 24.

24             THE COURT:  Good.

25             Do you have any further objections, Mr. Balducci?

```
 1                THE DEFENDANT:  No, your Honor.

 2                THE COURT:  So I'm going to return that report to the

 3    probation department, which is our practice.

 4                And at this point in time, I'm happy to hear from

 5    defense counsel and from Mr. Balducci and from government

 6    counsel, if they wish to be heard in connection with the

 7    sentence.

 8                MS. GAULI-RUFO:  Thank you, your Honor.  Lorraine

 9    Gauli-Rufo on behalf of Mr. Balducci.

10                Your Honor, I first want to note that your Honor

11    carefully went over many, many of the issues and many of the

12    mitigating factors that we have raised.  And I know your Honor

13    had a few questions and a few unanswered areas that I would

14    like to address, as well as to just reiterate what I think are

15    pertinent factors for your Honor.

16                THE COURT:  Sure.  And I didn't mean to preempt

17    anybody.  You can take as much as time as you need to present

18    on behalf of Mr. Balducci.

19                MS. GAULI-RUFO:  Thank you, your Honor.

20                As your Honor noted, I am suggesting -- the defense is

21    suggesting and requesting -- respectfully a noncustodial

22    sentence for Mr. Balducci.  And there are many mitigating

23    reasons for that, your Honor.  I'm just going to, as I said,

24    reiterate some of them.

25                This is an extremely serious crime.  And obviously the
```

1    nature of the crime is a 3553(a) factor that is necessary to

2    consider.  It's extremely serious, and we acknowledge that.  We

3    also acknowledge that that needs to be tempered with the

4    mitigating factors that are present in this case.

5           The first and foremost issue that I know your Honor

6    had gone over and I want to reiterate is the mental health

7    issue.  Your Honor read several sentences, maybe a paragraph,

8    from Mr. Balducci's mother-in-law.

9           And, your Honor, you are correct.  She is a doctor.

10   She's a psychologist.  I just had to review my notes.  And she

11   came into Mr. Balducci and his father's life at a time when

12   they were having extreme -- many issues.

13          And what she does point out in her letter, which I

14   think is significant, is that Mr. Balducci's mother had mental

15   issues as well.  And while Mr. Balducci himself doesn't

16   remember what she had specifically, he does remember a

17   childhood that was full of, you know, very sad situations that

18   occurred prior to his mother-in-law coming into his life.

19          And, by the way, he considers his mother-in-law to be

20   his mother for all intents and purposes.

21          THE COURT:  Do you mean his stepmother?

22          MS. GAULI-RUFO:  I'm sorry.  I mean his stepmother,

23   your Honor.  Yes.  His stepmother.

24          And there is also a reference in there about someone

25   getting murdered.  And that actually was Mr. Balducci's

 1    father's mother who was murdered.  And it was at a time --

 2    Mr. Balducci, again, wasn't there but does have recollections

 3    of this going on.

 4            So as your Honor suggested and as it becomes clear as

 5    we go through a lot of the facts and hints that are given about

 6    his childhood, there were a lot of unsettling issues going

 7    on -- mental health issues, murders.

 8            I think she even says that at one point, he wasn't

 9    eating.  He wasn't getting fed.  So, yes.  We can see that

10    these mental health issues and emotional issues probably

11    started a long time ago.

12            And also Mr. Balducci does acknowledge his drug use.

13    And what we do know is that people turn to drugs as a form of

14    medication.  He clearly was using them at a young age.  He

15    wasn't getting formal therapy at the time, and obviously we

16    realized much later that he probably should have had it at an

17    earlier age.

18            And they were exacerbated by his work at Rikers.  And

19    clearly, we don't have to -- we can imagine what it was like

20    going to Rikers every day and what was going on and what he was

21    experiencing.

22            And your Honor mentioned a really important factor,

23    like, why didn't he just resign.  You know, I'm getting

24    emotional right now even talking about this.  But you can see

25    in the letter from his stepmother and his father and what they

 1  went through and how proud they were.  They were so proud of

 2  him when he got this position.

 3       I think they even said they had some other law

 4  enforcement in the family, and it was just -- they were so

 5  proud of him.  And he I think just became -- didn't want to let

 6  them down; didn't want to let his father and his stepmother

 7  down and his son down, his son, who looked up to him -- and I'm

 8  sure would have looked up to him, no matter what with loving

 9  eyes.  But to him at that point, he just continued there.

10       And obviously, it was a big sign, when he attempted

11  suicide in 2020, that he should have left.  He should have

12  left.  He should have gotten the help he needed.  He didn't.

13  He didn't at the time.

14       We can see from the letters that were submitted,

15  people looked to him.  Mr. Balducci has no criminal history

16  whatsoever.  And he struggled.  It's clear that he was

17  struggling through life with all of these issues he went

18  through as a child.

19       He has no criminal history.  While obviously, he was

20  using drugs, it's not on the up-and-up.  He was using alcohol

21  and drugs.  But he has no criminal history.  And what the

22  letters say about him is that he's a kind-hearted person.  He's

23  a big man.  He's 6-foot.  He's solid.  People looked at him

24  like a teddy bear.  He's a kind-hearted man in this respect.

25            This situation, this crime that he committed, is so

1   out there.  Even the letters suggest, we can't wrap our heads

2   around how he could do this, how we could get to this point.

3          And I suggest to you, that, yes, a lot had to do with

4   the mental health issues that went untreated.  But this is an

5   aberration of character.  This is not how he maintained his

6   life until that point, nor after.

7          Your Honor, once he was arrested, he immediately

8   admitted his culpability.  He cooperated with the government.

9   He got a job.  He began working immediately.  And he has a lot

10  of motivation to do that, your Honor.

11         He has a ten-year-old son, a ten-year-old son, by the

12  way, who has a serious disability.  He has an illness.  And I'm

13  not even going to try to say it because I can't pronounce it,

14  but I know it's a disorder with protein.  And I have another

15  client's son who has that as well that went untreated for a

16  long time and caused actually severe damage to his mental

17  capabilities.

18         It's something that needs to be monitored.  It's

19  something that needs to be met with the medical attention that

20  it needs.  And Mr. Balducci is an attentive father.  That's

21  another thing that the letters says.

22         He's a loving father.  He's attentive to his son.  And

23  his son is, like I said, ten years old.  And he has special

24  needs with this preteen issue, with this diagnosis that I

25  cannot pronounce.  I'm sorry.

1          Your Honor went through so many of the factors of

2     3553(a).  And I really just want to focus on a couple of them,

3     the disparity and similarly situated defendants.  We know there

4     are a lot of them.  The government mentioned them, and your

5     Honor actually went through a lot of them.

6          I would note that, as your Honor did say, all of the

7     defendants, except for the one that was before

8     Judge Engelmayer, did not receive a custodial sentence.  And I

9     know that your Honor also said that the facts of the case

10    before Judge Engelmayer are serious.  I know that the facts of

11    Mr. Balducci are serious as well.  It was very serious.  Those

12    are dangerous things that were brought into the jail.

13         I also know that Mr. Balducci has very strong

14    mitigating factors -- the mental health issue, the mental

15    health issue that was apparent, was apparent and existing at

16    the time that he committed these acts.

17         And I know that -- I know that Mr. Balducci, since he

18    has been on pretrial release, has attended his therapy

19    sessions.  And I don't suggest -- I hope I did not suggest in

20    my submission.  I don't think Mr. Balducci would suggest it

21    either -- that he is finished with his mental health treatment.

22         I think he sees a long road ahead of him.  I think

23    that he understands that these are deep-seated issues that only

24    came out at such a time.  I think he would acknowledge --

25    certainly I acknowledge -- that if you attempt suicide, you are

1    at the end of your rope.  You have a long way to go to get back

2    to where you can go without therapy.  I think he probably

3    anticipates having therapy for the rest of his life.  I would

4    be surprised if he did not.

5          And I also agree that drug and alcohol therapy would

6    be definitely something that he should undertake.  Obviously he

7    resorted to that many times.  And I think that that's something

8    that he should be aware of and obviously something that he

9    should work on in order to be a productive member of society,

10   which is what he wants to be, your Honor, and what he has shown

11   that he wants to do and that he can do.

12         You know, a lot of the other factors -- educational,

13   vocation, medical care -- those are all factors of 3553(a) that

14   go into consideration.  And those are things that Mr. Balducci

15   can get at the outside.  He can get that, and he is getting it.

16         Should he get more intensive treatment?  He probably

17   should.  And I think he would probably agree that he should as

18   well.

19         During this time, your Honor, also, while he was

20   working at Stanley Steamer and while he was doing his mental

21   health treatment, he also had surgery for his shoulder.  So he

22   knows that he -- and he had a long time to recuperate and,

23   again, went right back to work, went right back to his

24   treatment with his mental health practitioner.

25         He knows that he needs the treatment.  He knows that

1   it's going to be, you know, probably a life-long treatment.

2   And I think that the resources that are out there, that are

3   outside of prison, are more conducive to him and will be more

4   helpful to him if he gets into, for example, an IOP, an IOP for

5   mental health or the dual treatment, which is mental health and

6   alcohol treatment that are available for people.

7           We talk about just punishment.  I know this is a

8   serious offense, your Honor.  But Mr. Balducci has lost his job

9   obviously.  He will not be a corrections officer or any kind of

10  law enforcement officer in the future.

11          He's shamed.  He's shamed.  His parents are -- he's

12  dealing with that shame of being a convicted felon.  A sentence

13  of -- a probationary sentence with strict conditions and,

14  particularly, a long period of time on house arrest or even in

15  an inpatient facility dealing with his mental health issues and

16  his substance abuse or an outpatient facility so he can

17  continue to work and provide for his son I submit would be

18  punishment in this case too.

19          And it would take into account, your honor, the

20  important factor that I did raise of him being a corrections

21  officer.  And while I know that shouldn't be a reason to just

22  skirt responsibility for anything -- I'm not saying that that

23  is what we are asking for.

24          I'm asking your Honor to consider that and how

25  differently he would be treated than any other person who would

1  be incarcerated because of his position as being an officer, a

2  corrections officer, that actually was at a jail.

3      That's very specific.  It's even more -- it's even

4  more than a police officer.  It's a corrections officer, and

5  he's going to be in a jail.  I think that needs to be taken

6  into account as well.

7      As your Honor noted, Mr. Balducci immediately agreed

8  to forfeiture when it was provided to him to disgorge him of

9  anything that he obtained.  He agreed to restitution.  And as I

10  noted before, he quickly came in.  He tried to cooperate.  He

11  did everything he could.  He knows he was wrong.  He knows this

12  was a crime.  He wants to put this behind him.

13      We submit, your Honor, that a lengthy period of time

14  in a facility as a condition of his probation would meet all of

15  the factors of 3553(a) that your Honor has gone over and that

16  we have reiterated and pointed out the factors that we think

17  are conducive of giving Mr. Balducci a sentence that is

18  noncustodial.

19      And for those reasons and the reasons that we

20  submitted in our sentencing submission, we again respectfully

21  request that your Honor consider a noncustodial sentence in

22  this case.  Thank you, your Honor.

23      THE COURT:  You bet.

24      Mr. Balducci.

25      THE DEFENDANT:  Yes, your Honor.  I would like to

1    apologize and say that I'm sorry for my actions, no matter what

2    my mental state was at the time.  I made an unsafe environment

3    for everyone.  I disgraced my uniform and my family name.

4           The uniform stands for the boldest, and I took the

5    coward's way out of corrections.  Everyone was so proud of me

6    when I got the job.  And after a while of getting urine and

7    feces thrown at me, getting into fights every day, spending 18

8    hours days at Rikers and the only socialization I would have

9    was with the inmates, it all started taking a toll on my and my

10   mental state.  I should have quit and left corrections before I

11   did any of the things I did.

12          I disappointed my family and my last name.  I will

13   spend the rest of my life making it up to them and show them

14   that I'm not the person who made those bad decisions.

15          My family needs me right now financially and

16   physically.  And because of my actions, I will burden everyone.

17   I promise one day I will make up to everyone and show them that

18   I'm a good person who made a bad decision.  I've since moved

19   upstate with my family and spend my days with them and working.

20          I take my parents to their doctors' appointments, I

21   take care of all of my dogs, and I also go to rehab for my arm.

22   I make food deliveries six days a week, and I'm lucky enough to

23   get my son every weekend.

24          I removed myself from everything that was negative in

25   my life.  I have finally found peace up here.  I know

1  your Honor is going to sentence me.  I only ask that you take

2  my words of remorse truly as they are meant to be.

3      And I would like to say that the key that was found,

4  that was from security.  They got into a fight with the inmate.

5  He broke the key, and he took it from Officer Lacenia.  That

6  had nothing to do with me.

7      THE COURT:  Okay.  I accept that.

8      THE DEFENDANT:  Thank you, your Honor.

9      THE COURT:  Before I turn to the government, two

10  housekeeping things in a sense.

11      I think I may have asked these things.  I want to just

12  make sure.  I want to make sure that you know, Defense Counsel

13  and Mr. Balducci, when I asked before if you had any objections

14  to the presentence report, there's another issue that I'll

15  raise.  It doesn't sound like it's necessary, but I want to

16  make sure.

17      So if there are facts that I have discussed or have

18  been discussed or you want to have discussed, I don't want you

19  to think you don't have the opportunity to prove some fact if

20  you wish to.

21      And I want to make sure you know that, even if you

22  needed more time, you know, to put together a hearing, if that

23  was necessary, I think you probably know that, Defense Counsel.

24  I want to make sure that that's offered to you and

25  Mr. Balducci.

1            MS. GAULI-RUFO:  Thank you, your Honor.

2            I am aware of that, and I do not think that we need

3    additional time.  And I think that Mr. Balducci probably just

4    corrected the only fact that he had an issue with.  And I

5    corrected one in the PSR, and I think that those are the only

6    two that were outstanding.  And I think we're okay with that.

7            Am I correct, Mr. Balducci?

8            THE DEFENDANT:  Yes.  You're correct.

9            THE COURT:  Okay.  And the other is we did say that

10    the presentence investigation report is okay as is with the

11    suggestion that you had, which you said is in there, Defense

12    Counsel.  I want to make sure -- and I think you both did say

13    that you had no further objections.

14            MS. GAULI-RUFO:  That's correct, your Honor.  No

15    further objections.

16            THE COURT:  And Mr. Balducci as well.

17            THE DEFENDANT:  Yes, your Honor.  No further

18    objection.

19            THE COURT:  All right.  Now I'll turn to the

20    government counsel, assistant U.S. attorney.  And then I'll

21    have more to say after that.

22            MR. SCHAEFFER:  Thank you, your Honor.

23            Just thinking quickly where the Court left off, with

24    respect to the objection that was raised by defense counsel as

25    to the facility in which Mr. Balducci actually worked,

1    following their raising that objection, we double checked with

2    the agents.

3          And they are correct.  He was scheduled to work in

4    that facility at some point but never actually did.  So the

5    government has no objection to that correction in the PSR.

6          THE COURT:  Good.  The PSR will stand corrected on

7    that score.

8          MR. SCHAEFFER:  Thank you, your Honor.

9          I would also note that in any event, that would have

10   no effect on the Court's sentence because there was no dispute

11   that he did in fact work in the facility where the offenses

12   took place.

13         With respect to the substantive matters before the

14   Court during a sentencing, your Honor, the government would

15   rest on its submission largely.

16         I would just respond briefly to some of the concerns

17   that have been raised.  The government has no, no doubt that

18   Mr. Balducci generally has relayed information about mental

19   health issues that he struggled with.  The government has no

20   doubt that he is a good person and a valued person to his

21   family and friends.

22         I would just point out that with respect to the

23   arguments that indicate that the culture and tenor of things at

24   Rikers Island were to blame for what happened to Mr. Balducci

25   or creating issues for Mr. Balducci, that may be, in some

1    sense, your Honor.

2         But that is also an argument that would be raised by

3    every single corrections officer.  And it cannot preclude

4    taking responsibility for what has actually happened here, nor

5    should it justify the events that actually have transpired.

6         Other than that, unless the Court has questions, we

7    would rest on our submission.

8         THE COURT:  So you raise a good point, Mr. Schaffer.

9    And here's how I see it -- and this is just based on my

10   experience.

11        For the benefit of Mr. Balducci, if it is of benefit,

12   I think I said earlier on I do perceive that there are these

13   big, unresolved, long-standing mental health conflicts or

14   whatever within.

15        And I also, in reading the letter that I read, the

16   portion of the letter from his stepmother, who counsel is

17   saying is a psychologist, it's almost impossible -- or not

18   impossible.  It's very difficult for people to see things as

19   they might really be.

20        So we have a perfect family, we have two dogs, we have

21   kids, everybody takes care of each other, and everybody loves

22   each other.  No problem here.  The big problem is the job, so

23   to speak, that created all of this turmoil.

24        And, by the way, I think it probably did trigger a

25   lot.  And I don't mean to be -- this is not in a critical way.

 1    I think that within the family structure, issues that are

 2    important and create stressors were never addressed.

 3            This is not the first time.  This happens very often.

 4    It's very easy, easier, to look at external forces and say,

 5    that's the problem.  It's much easier to do that than to look

 6    internally and figure out what the problem may really be.

 7            And I don't mean to be dramatic.  But in some

 8    respects, again my personal opinion for whatever it's worth,

 9    this whole episode at Rikers Island may ultimately turn out to

10    be a blessing more than anything else because it is creating

11    the opportunity to explore these issues seriously which have

12    never been explored before.  And I hope that Mr. Balducci takes

13    advantage -- and I suspect he will -- of the opportunity to

14    resolve these things.

15            Now, we have to talk about this unwarranted disparity

16    thing.  I don't believe that exists here.  I think

17    Judge Engelmayer was helpful in the sense that he drew some

18    lines.  And I'm going to just read from his transcript.

19            He said, "he," Judge Engelmayer, said in his

20    sentencing, which I thought was very perceptive, that:  "As a

21    matter of just punishment, your offense --" this is him talking

22    to Compres, the defendant "-- is far more serious than those of

23    the defendants in the cases before Judge Rakoff, Judge Caproni,

24    and Judge Buchwald."

25            And then he, "he," Engelmayer went on to say he read

1    those transcripts of each of the sentences.  And he says none

2    of those defendants, with the exception of Compres, who was the

3    person before him, smuggled weapons into the Rikers prison.

4    They smuggled things like cellphones and drugs and cigarettes.

5           Then he goes on to say -- and this is Judge Engelmayer

6    talking:  "I do not second-guess the sentences that my

7    colleagues found reasonable on the facts of those cases."

8           Then he goes on to say, Judge Engelmayer:  "But the

9    sentence of time served that even those defendants received

10   does not make sense to me here," to him, in the sentence in

11   which he imposed, six months.

12          "The smuggling of weapons into a jail and into the

13   hands of multiple inmates makes this case materially different

14   from --" the other cases, Caproni, Rakoff, and Buchwald.

15          So he draws that line.  I agree, in a sense -- I don't

16   know if anybody cares.  But my personal reaction is that

17   everybody is setting the bar way too low, you know, whether

18   it's the three cases or the Engelmayer case.  There is a

19   distinction between Judge Engelmayer's case, an important one,

20   about the dangerousness of what got smuggled in.

21          But I worry here in this whole tableau of cases if the

22   bar is being set too low.  Because in saying that there's a

23   difference and you're smuggling scalpels and whatever else, it

24   almost ignores what got smuggled that were not scalpels and

25   razors.  And those things are illegal also, and those things

 1    are serious.

 2             And those things that got smuggled is part of the

 3    chaos of Rikers Island.  This is just a personal aside.  And I

 4    agree with Judge Engelmayer, but the tableau of cases sets the

 5    bar way too low in my opinion.

 6             And Engelmayer goes on to say in his sentencing:

 7    "Your offense --" that's Compres " -- gravely endangered the

 8    safety of inmates, of guards, of other persons and employees.

 9    As a matter of just punishment, your smuggling in related to

10    inmates makes a sentence without meaningful time in prison a

11    nonstarter."

12             This is all from Judge Engelmayer.  He says he's also

13    to consider the interests of what are called general

14    deterrence.  He says:  "The need for the sentence to send a

15    message to other people that is sufficient to deter them from

16    engaging in similar criminal behavior.  This reinforces the

17    need for some prison time here.  The volume of contraband in

18    our municipal jails is alarming.  It is a problem of epidemic

19    proportion."  That's Judge Engelmayer.

20             And it is.  You know, and it's not only of these

21    dangerous weapons that's part of that epidemic.  So, you know,

22    we hear rumors that MCC, which is now closed -- I had a

23    sentencing once -- this is now on the federal side -- of a

24    young man who was charged with terrorist activities, or attempt

25    anyway.

1           He came into the court for sentencing.  I was going to

2     sentence him that day.  And he was in -- we have this holding

3     pen outside the courtroom.  When the proceeding starts, the

4     defendant is brought in.

5           And the lawyer, his lawyer, who was so remarkable,

6     asked that we adjourn the sentence.  And I know why.  And the

7     reason is that that young man -- he was an adult.  He was as

8     high as a kite because he could get ketamine, and he was lit up

9     for the sentence.

10          And I understood defense counsel, and we granted her

11    an adjournment.  She didn't want to have someone sentenced

12    acting high as a kite in the courtroom.

13          But I'm just saying that it's not just weapons that

14    are the problem, and it's just not drugs that's the problem.

15    And even cellphones, okay.  It sort of suggests in this tableau

16    of cases that we have that thank God it wasn't a cellphone.

17    It's okay to smuggle in cellphones because what harm can you do

18    with a cellphone.

19          But it's the principle, first of all, that you can't

20    do that.  And corrections officers know that.  You can't do

21    that for money.  Corrections officers know that.  And it just

22    poisons the entire system, and the system is a mess.

23          So even if it's cigarettes, right?  Harmless you say.

24    Well, it's just one piece of the puzzle that makes it so crazy

25    and wildly out of whack, and it makes the jails and the prisons

1    unable to function in part.

2           So that's what I mean by "setting the bar too low."

3    You know, now we're going to say it's okay to smuggle in all of

4    this stuff, but you can't smuggle in a scalpel.  I mean clearly

5    there's a distinction.  Clearly there's a bigger danger.  I

6    accept that.  I acknowledge that.  I don't want me, as a judge,

7    to be taken as setting the bar too low.

8           So I agree with Judge Engelmayer that his case is

9    different from those other cases.  But in my own personal

10   opinion, it's not different enough.  And if we don't start

11   setting the bar higher, we're not going to have a prison

12   system.

13          And in fact, MCC is closed because it's just

14   dysfunctional.  I hope they repair it.  I don't know what

15   they're going to do exactly.  But it's been a mess -- we all

16   know that -- for years.  And that's even worse in the state

17   system we understand.  So, anyway, enough from me about that.

18          I go back to Judge Engelmayer.  He says that what he

19   was trying to accomplish was that:  "If you smuggle weapons

20   into a New York City jail and you get caught, the tables will

21   turn, and you will become an inmate.  So don't do it.  The

22   solution to violence in a correctional institution is not

23   arming inmates.  That solution leads to madness."  He's right.

24   I agree with that 100 percent.

25          And then he goes on to say about his sentence, which

1    also applies to mine, although I don't necessarily agree

2    exactly with his outcome, he says:  "I have been mindful of a

3    number of mitigating factors."

4            And he's right about that.  We have to take into

5    account the mitigating factors, and I have.  Acceptance of

6    responsibility.  That's true of Mr. Balducci.  No question.

7    I'm considering that.

8            And he then goes on to talk about other things,

9    letters that the defendant submitted and other people submitted

10   on his behalf.  And he does say, it's important for sentencing

11   judges to consider the totality of peoples' lives, the good and

12   the bad.

13           Then he goes on to say, before he imposed the

14   six-month sentence, that he thinks that that is adequate and

15   appropriate.  He refers to a case that Judge Failla presided

16   over where she imposed six months where there was a Swiss army

17   knife smuggled into a prison facility.

18           So anyway, there's no doubt, in my mind, that there's

19   no unwarranted disparity here.  There may be different

20   sentences, but they're totally warranted.  And I don't believe

21   any are unwarranted.

22           So I'm about to sentence.  And I want to ask your

23   indulgence, if you'll give me five or ten minutes to just look

24   over my notes, etc.  Maybe you need a break as well.

25           It's now 10 minutes to 1:00.  If we could reconvene at

1   1:00.  If you could stay on the call, so to speak.  You don't

2   have to dial in again.

3           MS. GAULI-RUFO:  Thank you, your Honor.

4           MR. SCHAEFFER:  Yes, your Honor.

5           (Recess)

6           THE COURT:  I must say I thought that the government's

7   letter was very compelling.  They asked for a guideline

8   sentence.  In many respects, I think it makes perfect sense.

9           I am, however, going to sentence below the guidelines,

10  largely because of the mitigating factors that we've discussed

11  and particularly mental health and getting to the core of why

12  this behavior really took place and the issues that caused

13  Mr. Balducci to do what he did.

14          He's going to have to figure that out.  But I do think

15  that there's some work that needs to be done there in the

16  nature of mitigating factors, mental health in particular, and

17  also this drug issue.  I'm not sure that -- I think there might

18  be some work there too.

19          But in any event, I do intend to impose incarceration

20  for a period of ten months.  The guideline range is 18 to 24

21  months, the offense level is 15, and the criminal history

22  category is I.

23          That will be followed by three years of supervised

24  release, subject to what are called the mandatory conditions

25  that defendant not commit another federal, state, or local

1  crime.

2          That he not illegally possess a controlled substance.

3          That he refrain from any unlawful use of a controlled

4  substance.

5          He'll be required to submit to one drug test within 15

6  days of placement on supervision and at least two unscheduled

7  drug tests thereafter as may be directed by the probation

8  officer.

9          Then there are what we call the standard conditions.

10 They are also part of the sentence or will be.  He'll have to

11 comply with standard conditions 1 through 12 which are found at

12 pages 19 and 20 of the presentence investigation report.

13         And they include, among other things -- there are 12

14 of them -- that he may not own, possess, or have access to a

15 firearm, ammunition, destructive device, or dangerous weapon.

16 that's just an example.

17         And then plus the following what we call special

18 conditions are intended to be imposed.  And these special

19 conditions I'm finding are reasonably related to the factors

20 set forth in Section 3553(a)(1), (a)(2)(B), (a)(2)(C), and

21 (a)(2)(D).  And I also find that they involve no greater

22 deprivation of liberty than is reasonably necessary for the

23 purposes set forth in Section 3553(a)(2)(B), (a)(2)(C), and

24 (a)(2)(D) and are consistent with any pertinent policy

25 statements issued by the Sentencing Commission pursuant to 28

1   U.S. Code, Section 994(a).

2              And those special conditions include being supervised

3   in his district of residence; requiring that he report to

4   probation within 24 hours of his release from custody.

5              He's required to participate in a program approved by

6   the probation office for substance abuse, and that program

7   would include testing to determine whether he has reverted to

8   the use of drugs or alcohol.  I'm not saying he is or will be

9   at that time.  But that is required, the substance abuse

10  program.

11             He may be required to contribute to the costs of

12  services rendered as by a copayment in an amount to be

13  determined by the probation officer based on such factors as

14  ability to pay or availability of third-party payment.

15             And that is throughout the term of supervised release,

16  that substance abuse program, unless the Court modifies or

17  shortens that term.  But it has to be on application to the

18  Court.

19             In addition, he is required to participate in weekly

20  individual therapeutic counseling by a licensed therapist and

21  weekly group therapy supervised by a licensed therapist.  That

22  is also throughout the term of supervision.

23             He may be required here too to contribute to the costs

24  of services rendered as by a copayment in an amount to be

25  determined by the probation officer, again, based on such

1   factors as ability to pay and availability of third-party

2   payment.

3          I'm not imposing a fine.  Probation doesn't recommend

4   any fine by the way.

5          I do impose restitution in the amount, as we've

6   discussed, of $10,028.71.  And that document is to have the

7   terms and conditions of who to pay and when.

8          I think, Government Counsel, that gets payable to the

9   clerk of court, the Southern District of New York?

10         Do I have that right?

11         MR. SCHAEFFER:  It does, your Honor.  And there will

12  be a sealed schedule that actually discloses the person to whom

13  the restitution would then be paid by the court.

14         THE COURT:  Do I need to set a payment schedule at

15  all?  Or is that all taken care of in the agreed-to restitution

16  document?

17         MR. SCHAEFFER:  No, your honor.  The order will set

18  forth a payment schedule of approximately 10 percent of his

19  earnings per month.

20         THE COURT:  Okay.  So then there is the forfeiture

21  order, which was signed today.  I intend to impose that too.

22         And there's also a $200 special assessment which is

23  mandatory pursuant to 18 U.S. Code, Section 3013.

24         Briefly the reasons for the sentence, I think I've

25  expressed my reasons briefly pretty much throughout today's

1   sentencing proceeding.  I hope it has come across.

2          I'm varying from the guideline range fairly

3   dramatically.  The low end of the guideline range is 18 months,

4   and I'm sentencing to 10 months.  So it's a very substantial

5   variance, largely because of the factors that we talked about.

6          Notwithstanding that the offense level is 15, the

7   criminal history category is I, and the guideline range is 18

8   to 24 months, I believe the sentence is appropriate, given the

9   seriousness of the offense, two offenses, and the need for

10  punishment and deterrence.

11         I've considered the circumstances of the offense and

12  the history and characteristics of Mr. Balducci, including the

13  mental health issues, the issue of an attempted suicide, and

14  historical drug problems and issues.

15         I think this sentence reflects the seriousness of the

16  offense; promotes respect for the law; provides a just

17  punishment; affords adequate deterrence to criminal conduct;

18  helps protect the public from further crimes of defendant and

19  provides him with needed I'm calling them treatment in the most

20  effective manner, correctional treatment, namely, drug

21  treatment and mental health treatment.

22         So I'll give defense counsel, Mr. Balducci, and the

23  government an opportunity to add anything or say anything

24  before I actually impose that sentence.

25         MS. GAULI-RUFO:  Thank you, your Honor.  This is

1   Lorraine Gauli-Rufo on behalf Mr. Balducci.

2         Two things, your Honor:  Would your Honor consider

3   recommending Otisville to the Bureau of Prisons, which is in

4   upstate New York and we believe would be closest to his family?

5         THE COURT:  Yes.

6         MS. GAULI-RUFO:  Second of all, and I know this is a

7   little bit long, but Mr. Balducci has requested that your Honor

8   give a voluntary surrender date.  But his son's birthday, 11th

9   birthday, is June 16.

10         Would your Honor consider letting him voluntarily

11   surrender on June 17?

12         THE COURT:  So our norm is 30 days for surrender.

13   That would be May 16 by 2:00.  And I think I'm going to stick

14   to our policy.  I understand how important that could be, but I

15   think Mr. Balducci and his son will figure out a way to

16   connect.

17         MS. GAULI-RUFO:  Thank you, your Honor.

18         THE COURT:  The date for voluntary surrender is

19   May 16, 2022, by 2:00 p.m.

20         MS. GAULI-RUFO:  Thank you, your Honor.

21         THE COURT:  You bet.  I will recommend Otisville.

22         Mr. Balducci, do you wish to add anything?  I'm happy

23   to hear it.

24         THE DEFENDANT:  No, your Honor.  Thank you.

25         THE COURT:  Okay.  How about government counsel?

 1          MR. SCHAEFFER:  Nothing from the government, your

 2   Honor, other than to move to dismiss the open count.

 3          THE COURT:  Okay.  I'll grant that application.

 4          And now I'm going to actually impose the sentence as I

 5   just stated.

 6          Is Mr. Balducci still there?

 7          MS. GAULI-RUFO:  I believe he is, your Honor.

 8          Mr. Balducci.

 9          THE COURT:  There he is.

10          So the guideline range is 18 to 24 months.  And having

11   considered the Sentencing Reform Act of 1984 and particularly

12   the factors at 18 U.S. Code, Section 3553(a), it is the

13   judgment of this Court that Defendant Robert Balducci be

14   committed to the custody of the Bureau of Prisons to be

15   imprisoned for a term of ten months.

16          The surrender date is May 16, I believe we said by

17   2:00 p.m.  I will make a recommendation for Otisville.

18          That is to be followed by three years of supervised

19   release with the mandatory and the standard and the special

20   conditions that I mentioned and described before.  And I

21   incorporate that description and those conditions here by

22   reference.

23          No fine.  Restitution is taken care of.

24          Mr. Schaffer, I am waiting for a restitution order

25   separate?

1          MR. SCHAEFFER:  Yes, your Honor.

2          THE COURT:  That's on its way.  Okay.  Good, because I

3     do have the forfeiture order.

4          I'm also imposing a special assessment of $200 which

5     is due immediately.

6          And for the reasons why I sentenced as I did, I think

7     now I've said it several times.  But the bottom line is I think

8     this is really a serious matter and I think actually virtually

9     every 3553(a) factor supports this sentence.

10         And I incorporate that discussion that's been going on

11    throughout this sentencing proceeding, including the

12    seriousness of the offense, the need for punishment and

13    deterrence, and the others as discussed more fully.

14         So here is a question for the lawyers:

15         Do either counsel know of any legal reason why the

16    sentence should not be imposed as so stated?

17         Starting with the government.

18         MR. SCHAEFFER:  No, your Honor.

19         THE COURT:  Defense counsel.

20         MS. GAULI-RUFO:  No, your Honor.

21         THE COURT:  Then I hereby order that the sentence be

22    imposed as so stated.

23         I need to find Mr. Balducci again for a moment.

24         Mr. Balducci, I need to talk about the waiver of

25    appeal rights that are contained in the plea agreement and just

1   go over those with you.

2       To the extent that you have not already waived your

3   appeal rights -- and now I am talking about the plea agreement

4   dated September 13, 2021, which has some very significant

5   waivers.

6       They're waivers including the right to file a direct

7   appeal is waived, and the otherwise right to bring a collateral

8   challenge, including but not limited to an application under

9   Title 28, U.S. Code, Sections 2255 or 2241, of any sentence

10  that is within or below the stipulated guideline range of 18 to

11  24 months in prison.

12      This sentence, of course, is substantially lower than

13  that guideline range. And so these waivers that are set forth

14  in the plea agreement of course apply. If there are any legal

15  issues or issues that I'm not aware of and haven't mentioned

16  here, then I notify you that you have the right to appeal those

17  issues.

18      And you also waived the right to appeal or bring a

19  collateral challenge of any forfeiture amount that is less than

20  or equal to $2,800. Also you agreed not to appeal or

21  collaterally challenge a restitution amount that is less than

22  or equal to $10,028.72.

23      So I think probably counsel could discuss that further

24  with Mr. Balducci. But it's all set forth in the plea

25  agreement.

1              And the government has moved to dismiss open counts.

2    I grant that application.

3              And starting with the government, do you wish to add

4    anything to today's sentencing proceeding?

5              MR. SCHAEFFER:  No.  Thank you, your Honor.

6              THE COURT:  How about defense counsel?

7              MS. GAULI-RUFO:  No, your Honor.  Thank you.

8              THE COURT:  I have to say it's been a pleasure to work

9    with both defense counsel and the government counsel and with

10   Mr. Balducci as well.  The only thing I have remaining to say,

11   Mr. Balducci, is to wish you all the best going forward.  I

12   really mean that.

13             THE DEFENDANT:  Thank you, your Honor.

14             THE COURT:  You bet.  Otherwise, we're adjourned for

15   today.  Thanks, everybody.

16             MS. GAULI-RUFO:  Thank you, your Honor.

17             (Adjourned)

18

19

20

21

22

23

24

25